UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY A. RADCLIFF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:11CV 1287 LMB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Jeffrey A. Radcliff for a Period of Disability and Disability Insurance

Benefits under Title II of the Social Security Act, and Supplemental Security Income under Title

XVI of the Act.  This case has been assigned to the undersigned United States Magistrate Judge

pursuant to the Civil Justice Reform Act and is being heard by consent of the parties.  See 28

U.S.C. § 636(c).  Plaintiff filed a Brief in support of the Complaint.

(Doc. No. 25).  Defendant filed a Brief in Support of the Answer.  (Doc. No. 28).

## Procedural History

On December 30, 2008, plaintiff filed his application for benefits, claiming that he became

unable to work due to his disabling condition on May 24, 2006.  (Tr. 12, 111-21).  This claim was

denied initially, and following an administrative hearing, plaintiff's claim was denied in a written

opinion by an Administrative Law Judge (ALJ), dated May 6, 2010.  (Tr. 63-69, 12-20).  Plaintiff

then filed a request for review of the ALJ's decision with the Appeals Council of the Social

- 1 -

Security Administration (SSA), which was denied on May 20, 2011.  (Tr. 6, 1-3).  Thus, the

decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981,

416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on January 26, 2010.  (Tr. 27).  Plaintiff was

present and was represented by counsel.  (Id.).  Also present was vocational expert Vincent

Stock.  (Id.).

The ALJ questioned plaintiff, who testified that he was twenty-six years of age, and had

completed the tenth grade.  (Tr. 30).  Plaintiff stated that he lived with his parents.  (Id.).

Plaintiff testified that he last worked on October 31, 2008.  (Id.).  Plaintiff stated that his last

position involved working on an assembly line for Rug Doctor.  (Tr. 31).

Plaintiff testified that he collected unemployment benefits in the last quarter of 2008, and

all through 2009.  (Id.).  Plaintiff stated that he was not collecting unemployment benefits at the

time of the hearing.  (Id.).  Plaintiff acknowledged that he told the State that he was ready,

willing, and able to work in order to receive unemployment benefits, and that this representation

was inconsistent with his application for disability benefits.  (Tr. 32).  Plaintiff testified that he

filed applications for employment.  (Id.).  Plaintiff stated that he did not believe he was able to

work because he was hospitalized frequently due to low oxygen levels and pain.  (Id.).

Plaintiff testified that, on a typical day, he spent the majority of his day sleeping.  (Tr. 33).

Plaintiff stated that he takes antidepressant medication, which helps him to get up and shower.

(Id.).  Plaintiff testified that he experiences chest pain when he uses his right arm too much.  (Id.).

Plaintiff stated that his doctors had not determined the etiology of his pain complaints. (Id.). Plaintiff testified that he had an appointment scheduled with a pain specialist, who planned to give him injections in his lungs.  (Id.).

Plaintiff stated that, since his surgery in 2006, his doctors had treated his right lung with breathing treatments, pain patches, and medication.  (Tr. 34).  Plaintiff testified that his doctors also told him not to lift anything because he experienced severe pain when he bent over and picked up items.  (Id.).  Plaintiff stated that he lost his job at Rug Doctor because he was taken out by an ambulance about every other week.  (Id.).

Plaintiff testified that he had not undergone an eye examination recently.  (Id.).  Plaintiff stated that he had minimal vision in his right eye due to an injury he sustained when he was fourteen.  (Id.).  Plaintiff testified that his right eye had to be reconstructed after he was hit in his eye with a golf club.  (Id.).  Plaintiff stated that the vision in his left eye was "fine."  (Tr. 35).

Plaintiff testified that he had a pending workers' compensation claim with regard to his lung problems.  (Id.).

Plaintiff stated that he was able to walk for about fifteen minutes before he had to sit down due to shortness of breath.  (Id.).  Plaintiff testified that he was able to stand for fifteen to twenty minutes, if he could occasionally lean against the wall.  (Id.).  Plaintiff stated that he was able to sit for about thirty minutes, although he constantly squirmed due to back pain.  (Id.).  Plaintiff testified that he was able to lift about ten pounds.  (Tr. 36).

Plaintiff stated that he was taking Ambien,[1] Celexa,[2] Neurontin,[3] Lidoderm patches,[4] Combivent,[5] and Vicodin[6] at the time of the hearing.  (Id.).  Plaintiff testified that he used the Combivent inhaler three to four times a day.  (Id.).  Plaintiff stated that he last saw a pulmonologist about one month prior to the hearing, and that he had an appointment scheduled with a pulmonologist on March 8, 2010.  (Id.).  Plaintiff testified that he had been experiencing difficulty with coughing and shortness of breath in the morning.  (Tr. 37).

Plaintiff stated that he saw a psychiatrist once a month, and he saw a therapist once a week.  (Id.).

Plaintiff's attorney examined plaintiff, who testified that his lung collapsed when he inhaled brick dust at work in 2006.  (Tr. 38).  Plaintiff stated that he underwent three surgeries, and underwent the placement of four chest tubes.  (Id.).  Plaintiff testified that his three surgeries occurred during the course of two hospitalizations.  (Tr. 39).  Plaintiff stated that he had also been treated with pain medication, oxygen, and exercises.  (Id.).

Plaintiff testified that he had been to the emergency room for breathing-related problems

---

[1]Ambien is indicated for the short-term treatment of insomnia characterized by difficulties with sleep initiation.  See Physician's Desk Reference, ("PDR"), 2692 (63rd Ed. 2009).

[2]Celexa is an antidepressant drug indicated for the treatment of depression.  See PDR at 1161.

[3]Neurontin is indicated for the treatment of nerve pain.  See WebMD, http://www.webmd.com/drugs (last visited August 30, 2012).

[4]The Lidoderm patch is indicated for the relief of pain associated with post-herpetic neuralgia.  See PDR at 1115.

[5]Combivent inhalation aerosol is indicated for the treatment of COPD.  See PDR at 846.

[6]Vicodin is indicated for the relief of moderate to moderately severe pain.  See PDR at 529.

about twelve times.  (Tr. 40).  Plaintiff stated that he started experiencing right-sided chest pain after using his right arm at work.  (Id.).  Plaintiff testified that he would either pass out or collapse at work, and wake up in the hospital or in the back of an ambulance.  (Id.).

Plaintiff stated that he was working as a union carpenter when his lung collapsed.  (Id.). Plaintiff testified that he had not worked as a union carpenter since the day he went to the hospital in 2006 because he was unable to perform carpentry work.  (Tr. 41).

Plaintiff stated that he tried to perform a position installing siding on houses in late 2007 or early 2008.  (Id.).  Plaintiff testified that he was terminated from this position after one week because he was unable to perform the work.  (Id.).

Plaintiff stated that he subsequently worked through a temp service for Rug Doctor.  (Id.). Plaintiff testified that he performed this position for almost a year before he was terminated for going to the hospital too frequently.  (Id.).  Plaintiff stated that he sat down at the Rug Doctor position, and he still experienced problems.  (Id.).  Plaintiff testified that he performed assembly work at this position, and that he had quotas.  (Tr. 42).  Plaintiff stated that he was not able to meet his production quotas.  (Id.).  Plaintiff testified that his employer moved his work station near a chemical sink, which caused him to experience breathing problems.  (Id.).  Plaintiff stated that he informed his supervisors about his breathing difficulties, and they tried to accommodate him by moving him to different locations.  (Tr. 43).  Plaintiff testified that this employer also accommodated him by not requiring that he unload trucks.  (Id.).  Plaintiff stated that he was eventually terminated due to his frequent hospital visits.  (Id.).

Plaintiff testified that he was unable to lift more than ten pounds due to a combination of weakness from surgeries, and his breathing difficulties.  (Tr. 44).  Plaintiff stated that he

experienced pain and weakness in his chest when he lifted.  (Id.).

Plaintiff testified that an employee at the Social Security Administration office told him that it "wouldn't be a problem" to file for unemployment benefits.  (Tr. 45).

Plaintiff stated that the only household chores he performed were loading the dishwasher, and taking out the trash.  (Id.).  Plaintiff testified that he only left his house to attend medical appointments.  (Id.).

Plaintiff testified that he saw his psychiatrist once a month.  (Tr. 46).  Plaintiff stated that he saw his primary doctor, Dr. Paul Metcalf, at least twice a month.  (Id.).  Plaintiff stated that he was trying to schedule an appointment with Dr. Metcalf at the time of the hearing, due to complaints of chest pains in the center of his chest.  (Id.).  Plaintiff testified that he never experienced chest pain prior to his accident.  (Id.).

Plaintiff stated that he did not attend social events, or visit with friends.  (Tr. 47).  Plaintiff testified that he did not consume alcohol or smoke.  (Id.).  Plaintiff stated that his mother shopped for him.  (Id.).  Plaintiff testified that he did not cook, other than opening cans and heating food on the stove.  (Id.).  Plaintiff stated that he did not perform any household chores because he was physically unable to perform them.  (Id.).

Plaintiff testified that he also experienced severe depression.  (Id.).  Plaintiff stated that he did not experience any symptoms of depression prior to his accident.  (Tr. 48).

Plaintiff testified that his doctors have mentioned possibly starting him on oxygen, although he was trying to avoid this.  (Tr. 48).  Plaintiff stated that he had an upcoming appointment with a pain specialist, who planned to administer injections in his lungs to relieve his pain.  (Id.).

Plaintiff testified that he would not be able to perform another position like the Rug Doctor position because he was unable to perform this position even when his employer was trying to accommodate him.  (Tr. 49).

Plaintiff stated that his doctors have recommended stretching exercises, although this makes him "hyperventilate."  (Id.).

Plaintiff testified that he starts to hyperventilate when he experiences pain in his chest. (Tr. 50).  Plaintiff explained that the pain makes him breathe deeply, and then he loses his breath. (Id.).  Plaintiff testified that he is unable to breathe when he wakes up in the morning.  (Id.). Plaintiff stated that he coughs and occasionally coughs up blood in the morning.  (Id.).  Plaintiff testified that he takes his Combivent and lies down when this occurs.  (Id.).  Plaintiff stated that this has been occurring every morning for the past three weeks, and that his doctor is aware of this.  (Id.).

Plaintiff testified that he did not obtain his GED.  (Tr. 51).  Plaintiff stated that he started attending GED classes at Jefferson College, but quit because he experienced severe depression. (Id.).  Plaintiff testified that he planned to start taking GED classes again in February of 2010. (Id.).

The ALJ re-examined plaintiff, who testified that he worked for Elders Exteriors in 2007, although he was not sure of the dates of his employment.  (Tr. 53).

Plaintiff stated that he attended church all day on Sundays.  (Id.).

Plaintiff testified that he attended GED classes four to five days a week at Jefferson College for about four months.  (Id.).

Plaintiff stated that he received emergency room treatment at St. Joseph's hospital, St.

- 7 -

Anthony's hospital, and Des Peres hospital.  (Tr. 54).  The ALJ noted that there was only one record of plaintiff arriving at the emergency room by ambulance.  (Id.).

Plaintiff's attorney re-examined plaintiff, who testified that he arrived at the emergency room by ambulance from his work on the majority of his twelve emergency room visits.  (Tr. 55).  Plaintiff stated that on some occasions, a family member drove him to the hospital.  (Id.).

The ALJ then examined the vocational expert, Vincent Stock.  (Id.).  The ALJ asked Mr. Stock to assume a hypothetical claimant with plaintiff's characteristics and the following limitations: limited to performing light exertional work; can occasionally climb stairs and ramps; never climb ropes, ladders and scaffolds; should not work any jobs that require depth perception; must work in a temperature controlled environment to avoid extreme heat, cold, wetness and humidity; should avoid even moderate exposure to any type of pulmonary irritants; and should avoid concentrated exposure to unprotected heights and hazardous machinery.  (Tr. 57).  Mr. Stock testified that the claimant could perform plaintiff's past positions as a cashier and a fast food worker, as they were performed in the national economy.  (Id.).  Mr. Stock stated that the claimant could perform plaintiff's ice cream position as it was performed in the national economy as well as the way plaintiff performed it.  (Id.).  Mr. Stock testified that all of plaintiff's past work was unskilled.  (Tr. 58).

The ALJ next asked Mr. Stock to assume the same limitations as the first hypothetical except that the individual is limited to sedentary work.  (Id.).  Mr. Stock testified that none of plaintiff's past work would be available.  (Id.).  Mr. Stock stated that the individual would be capable of performing other work, including the positions of assembly line fabricator (120,000 positions nationally, 3,000 positions in Missouri); and night clerk at a hotel (same).  (Id.).

- 8 -

The ALJ then asked Mr. Stock to assume the same limitations as the second hypothetical, with the additional limitations that any job must allow for occasional unscheduled disruptions of both the workday and workweek secondary to the effects of medication, inability to concentrate for a full eight hours during the day, and potentially the necessity to lie down for extended periods of time during the day.  (Tr. 60).  Mr. Stock testified that there would be no jobs in the national or regional economy that such an individual could perform.  (Id.).

Plaintiff's attorney then examined Mr. Stock, who testified that a GED would be required to obtain a position as a night clerk at a hotel.  (Tr. 60).

The ALJ indicated that he would hold the record open for sixty days so that plaintiff's attorney could submit records from plaintiff's March 8, 2010 visit with his pulmonologist.  (Tr. 61).

**B.**     **Relevant Medical Records**

The record reveals that plaintiff presented to the emergency room at St. Anthony's Medical Center on May 24, 2006, with complaints of right flank pain radiating to the abdomen. (Tr. 653).  Plaintiff had a history of renal stones.  (Id.).  Plaintiff complained of nausea and vomiting for the past four days, and shortness of breath, cough, and intermittent right-sided chest pain for the past month.  (Id.).  Plaintiff underwent a chest x-ray, which revealed right-sided pneumothorax.[7]  (Id.). Plaintiff was diagnosed with right-sided spontaneous pneumothorax,

---

[7]A collapsed lung, or pneumothorax, is the presence of free air or gas in the pleural cavity. Stedman's Medical Dictionary, 1526 (28th Ed. 2006).

hematuria,[8] nephrolithiasis,[9] right urethral stone, and possible urinary tract infection.  (Id.).

Plaintiff underwent placement of a chest tube.  (Id.).  Plaintiff was treated with pain medication

and intravenous antibiotics.  (Tr. 654).  Plaintiff was discharged on May 27, 2006.  (Tr. 644).

Plaintiff was admitted at St. Anthony's Medical Center from May 30, 2006, through June

4, 2006, with a recurrent spontaneous pneumothorax.  (Tr. 752).  Plaintiff reported that he

believed he had been exposed to dust as a brick layer, and that this was exacerbating his

difficulties.  (Id.).  It was noted that the current pneumothorax was slightly less than the previous

one.  (Id.).  Plaintiff underwent an exploration thoracoscopically due to the recurrence.  (Id.).

The procedure revealed a relatively normal lung; and a normal bronchoscopy.[10]  (Tr. 800).

Plaintiff was prescribed Percocet[11] upon discharge.  (Tr. 752).  The physician indicated that he

doubted that exposure to dust for one month was the cause of his spontaneous pneumothorax,

and that it was probably caused by his congenital weakness in the lung.  (Id.).

Plaintiff was admitted at St. Anthony's Medical Center from June 10, 2006, through June

13, 2006, for recurrent right pneumothorax.  (Tr. 564).  Plaintiff was kept on conservative

management with high oxygen levels, and a chest x-ray revealed rapid resolution of his

pneumothorax.  (Id.).  Upon discharge, plaintiff was instructed to do no exertional activity until

he was seen for follow-up in seven to ten days.  (Id.).  Plaintiff was prescribed Vicodin.  (Id.).

---

[8]Presence of blood or red blood cells in the urine.  Stedman's at 864.

[9]Presence of renal calculi.  Stedman's at 1290.

[10]Inspection of the interior of the tracheobronchial tree through a bronchoscope.
Stedman's at 271.

[11]Percocet is indicated for the relief of moderate to moderately severe pain.  See PDR at
1127.

Plaintiff was admitted at St. Anthony's Medical Center from June 29, 2006, through July 6, 2006, for recurrent pneumothorax.  (Tr. 364).  Plaintiff underwent a bronchoscopy, thoracotomy,[12] and pleurectomy.[13]  (Id.).  Upon discharge, plaintiff's chest x-ray revealed adequate re-expansion of the lung.  (Id.).  Plaintiff was prescribed Vicodin.  (Id.).

Plaintiff presented to Peter Fonseca, M.D. on August 9, 2006, with complaints of pain throughout his entire right and left chest.  (Tr. 227).  Plaintiff reported pain to the right of the midline of his sternum when he bends over, and complained of occasional shortness of breath, difficulty sleeping, and difficulty raising his right arm.  (Id.).  Plaintiff requested that Dr. Fonseca write a letter stating that his spontaneous pneumothoraces were a result of his work environment. (Id.).  Dr. Fonseca stated that he had never heard of a spontaneous pneumothorax being created in the work environment.  (Id.).  Plaintiff reported that he had literature indicating that materials used in his work environment were pulmonary toxic.  (Id.).  Dr. Fonseca requested that plaintiff forward the literature to him.  (Id.).

Plaintiff saw Dr. Fonseca on September 6, 2006, at which time plaintiff reported improvement, but still complained of some discomfort or numbness in the right chest area as well as the right posterior back.  (Tr. 228).  Dr. Fonseca indicated that plaintiff brought information regarding a possibility of silicosis[14] after prolonged exposure to material he used at work.  (Id.).  Dr. Fonseca stated that a lung biopsy revealed no evidence of silicosis, and that he did not believe

---

[12]Incision through the chest wall into the pleural space.  Stedman's at 1982.

[13]Excision of pleura, which is the membrane enveloping the lungs and lining the walls of the pulmonary cavities.  See Stedman's at 1512.

[14]A form of lung disease resulting from occupational exposure to and inhalation of silica dust over a period of years.  Stedman's at 1773.

a short course of exposure could have been the etiology of his spontaneous pneumothorax.  (Id.).

Plaintiff saw Dr. Fonseca on October 13, 2006, at which time plaintiff reported that he had no right chest or arm complaints, but had pain in the left lower quadrant of his abdomen.  (Tr. 229).  Plaintiff also reported that he was vomiting and having dry heaves in the morning.  (Id.). Plaintiff indicated that his pain was so severe one week ago that he had to curl into a ball.  (Id.). Plaintiff's physical examination was essentially unremarkable.  (Id.).  Plaintiff's lungs were clear. (Id.).  Dr. Fonseca recommended that plaintiff go to the emergency room for further evaluation of a possible hernia or kidney stone.  (Id.).

Plaintiff presented to Anthony S. Shen, M.D., at Pulmonary and Critical Care Medicine L.L.C., on October 18, 2006, with complaints of shortness of breath, cough, and pneumothoraces after dust exposure.  (Tr. 880-82).  Plaintiff indicated that he started working with a product called Novabrik in the winter or spring of 2006, without any dust protection.  (Tr. 880).  Plaintiff also reported a history of a truck accident in 2001, and of an eye injury when he was ten years old.  (Id.).  Dr. Shen noted that none of these injuries left any permanent impairments.  (Id.). Upon examination, plaintiff had a dry cough, good breath sounds, expiratory prolongation, and occasional wheeze and rhonchus[15] with forced expiration.  (Tr. 881).  Dr. Shen stated that plaintiff had an acute dust exposure for which Dr. Shen did not have the Material Safety Data Sheets.  (Id.).  Dr. Shen indicated that he was in the process of obtaining the Safety Data Sheets. (Id.).  Dr. Shen stated that plaintiff appeared to have bronchospasm and pneumothorax as a result

---

[15]An added sound with a musical pitch occurring during inspiration or expiration, heard on auscultation of the chest and caused by air passing through bronchi that are narrowed by inflammation, spasm of smooth muscle, or presence of mucus in the lumen.  Stedman's at 1693.

- 12 -

of his acute dust exposure.  (Id.).  Dr. Shen indicated that plaintiff also had a history of right eye

blindness due to a previous accident at approximately ten years old.  (Id.).  Dr. Shen

recommended that plaintiff be placed on bronchodilators, and undergo further testing.  (Id.).

Plaintiff presented to Dr. Fonseca on January 19, 2007, at which time plaintiff reported

that he no longer had any abdominal pain, but complained of pain under his arm.  (Tr. 233).

Plaintiff's physical exam was unremarkable.  (Id.).  A chest x-ray revealed excellent re-expansion

of the lung with no evidence of recurrent pneumothorax.  (Id.).  Plaintiff had some tenderness

near the axillary region, and some chest tube incisional discomfort.  (Id.).  Dr. Fonseca prescribed

Neurontin, and recommended that plaintiff be evaluated for physical therapy.  (Id.).  Dr. Fonseca

indicated that plaintiff requested a letter stating that he was unable to work.  (Id.).  Dr. Fonseca

stated that it was his policy of not performing disability determinations, and that he should discuss

this issue with his attorney and obtain an opinion from someone who specializes in disability

determinations.  (Id.).  Dr. Fonseca noted "I would have thought he would have returned to work

several months ago, in light of no complaints when seen three months ago.  From my standpoint

he should be fully recovered from his surgery at this point and in fact 3 months ago appeared to

be so."  (Id.).

Plaintiff saw Dr. Fonseca on March 9, 2007, at which time plaintiff reported that he was

doing remarkably better.  (Tr. 232).  Plaintiff was able to raise his arm.  (Id.).  Plaintiff

complained of a feeling of heaviness over his right pectoralis region particularly when he moves

his shoulder back and takes a deep breath, but indicated that it was nothing like before.  (Id.).

Plaintiff reported that he felt that he was relatively back to normal.  (Id.).  Plaintiff's physical

examination was completely unremarkable.  (Id.).  Dr. Fonseca found hat plaintiff had "recovered

from all his major difficulties." (Id.). Dr. Fonseca advised plaintiff to follow-up only on an as-needed basis. (Id.).

Plaintiff presented to St. Joseph Hospital of Kirkwood on June 6, 2007, with complaints of vomiting and chest pain. (Tr. 336). Plaintiff's physical examination revealed respiratory distress with tachypnea.[16] (Id.). Plaintiff was diagnosed with vomiting and chest wall pain. (Tr. 337). He was given IV fluids, nausea medication, and pain medication, which eliminated his symptoms. (Id.). Plaintiff was discharged in good condition, and was instructed to take ibuprofen as needed for pain. (Id.).

In a letter to Dr. Catanzaro at Concentra dated September 19, 2007, Dr. Fonseca stated that plaintiff's diagnosis was spontaneous pneumothoraces, and summarized plaintiff's surgical history. (Tr. 242). Dr. Fonseca indicated that he was a specialist in general thoracic surgery, and was not plaintiff's personal physician. (Id.). Dr. Fonseca stated that plaintiff "at this point has no surgical restrictions or limitations of duty." (Id.).

Plaintiff was admitted to Missouri Baptist Medical Center on January 24, 2008, for evaluation of complaints of shortness of breath and right-sided chest pain. (Tr. 217). Plaintiff underwent a chest x-ray, which revealed no evidence of acute cardiopulmonary disease. (Tr. 221). A pulmonary function study revealed air trapping with severe obstruction, which was improved after use of the bronchodilator. (Tr. 222).

Plaintiff presented to St. Joseph Hospital of Kirkwood on February 27, 2008, with complaints of abdominal pain. (Tr. 321). Upon examination, plaintiff had severe tenderness in the right chest wall, and moderate tenderness in the right upper quadrant. (Tr. 322). Plaintiff's

---

[16]Rapid breathing. Stedman's at 1932.

- 14 -

chest x-ray was normal.  (Id.).  An abdominal CT scan revealed a single urinary calculus in the

right kidney.  (Id.).  Plaintiff was diagnosed with diarrhea and chest wall pain.  (Id.).  Plaintiff was

discharged in stable condition, and was instructed not to work for two days and to drink plenty of

fluids.  (Id.).

Plaintiff presented to St. Joseph Hospital of Kirkwood by ambulance on May 20, 2008,

with complaints of chest pain with nausea and difficulty breathing.  (Tr. 309).  Upon examination,

plaintiff's chest pain was reproducible with palpation of the anterior chest wall and sternum.  (Id.).

Plaintiff had normal breath sounds on the left and diminished breath sounds on the right.  (Id.).

Plaintiff underwent a chest x-ray, which revealed no acute disease.  (Tr. 310).  Plaintiff's

symptoms were much better after IV analgesia.  (Id.).  Plaintiff was diagnosed with

costochondritis.[17]  (Id.).  Plaintiff was discharged in good condition.  (Id.).  He was prescribed

ibuprofen, and was instructed not to work that day.  (Id.).

Plaintiff presented to Des Peres Hospital on June 13, 2008 due to complaints of face

tingling and chest pain.  (Tr. 932).  Plaintiff was diagnosed with chest pain and anxiety.  (Tr. 941).

Plaintiff was prescribed medication.  (Id.).

Plaintiff presented to St. Joseph Hospital of Kirkwood on June 19, 2008, with complaints

of moderate chest pain in the left chest area and difficulty breathing.  (Tr. 289).  Plaintiff reported

that he was at work and his co-workers thought he looked pale, so they called medics.  (Id.).

Upon physical examination, plaintiff's breath sounds were abnormal and plaintiff had decreased air

movement in the right lung.  (Tr. 290).  Plaintiff had mild weakness in the left arm, and altered

---

[17]Inflammation of one or more costal cartilages, characterized by local tenderness and pain
of the anterior chest wall that may radiate.  Stedman's at 450.

sensation to light touch on the left face.  (Id.).  Plaintiff was diagnosed with chest pain and

weakness of the left upper extremity.  (Id.).  Plaintiff reported that he felt better and wanted to go

home.  (Id.).  Plaintiff was discharged in stable condition, and was instructed not to work the

following day, and to follow-up with a physician.  (Id.).

Plaintiff presented to St. Joseph Hospital of Kirkwood on June 26, 2008, with complaints

of paresthesia, facial droop, and difficulty walking, which started weeks prior.  (Tr. 280).  Upon

examination, no respiratory distress was noted and plaintiff's breath sounds were normal.  (Tr.

281).  Plaintiff had normal range of motion of the extremities.  (Id.).  Plaintiff complained of

weakness of the left face, left arm, left hand, left leg, and left foot.  (Id.).  The examining

physician noted that there was "some question of the authenticity of the patient's efforts to follow

commands and move the left side of his body."  (Id.).  An MRI of the brain revealed no acute

disease.  (Id.).  Plaintiff was diagnosed with weakness of unclear etiology.  (Id.).  Plaintiff was

instructed to follow-up as needed and to not work until he was cleared.  (Id.).

Plaintiff presented to St. Joseph Hospital of Kirkwood on November 7, 2008, with

complaints of coughing up bright red blood for four days.  (Tr. 244).  Plaintiff also reported

shortness of breath and wheezing, but no chest pain.  (Id.).  Upon examination, plaintiff had

wheezes but no rales.[18]  (Tr. 245).  Plaintiff was diagnosed with hemoptysis,[19] cough, kidney

stone, and hematuria, and was admitted.  (Tr. 246).  Pulmonary and Urology consultations were

ordered, and it was indicated that plaintiff's pain would be controlled and his hernia would be

_____

[18]Ambiguous term for an added sound heard on auscultation of breath sounds.  Stedman's
at 1626.

[19]Spitting of blood derived from the lungs or bronchial tubes as a result of pulmonary or
bronchial hemorrhage.  Stedman's at 872.

repaired electively when his acute pulmonary problems resolved.  (Tr. 250).  Plaintiff saw Leslie B. Pilson, M.D. for a pulmonary consult on November 10, 2008.  (Tr. 250).  Upon examination, there were some bronchial breath sounds in the right middle and lower lung fields posteriorly, otherwise plaintiff's lungs were clear and his respiratory effort was unlabored.  (Tr. 252).  Dr. Pilson diagnosed plaintiff with right ureterolithiasis;[20] hemoptysis related to previous silica exposure; and hypoxemia.[21]  (Id.).  Dr. Pilson noted that the hemoptysis seemed to be stable over time, although plaintiff could likely benefit from bronchoscopy.  (Id.).  Dr. Pilson recommended further testing.  (Id.).

Plaintiff was admitted to St. Joseph Hospital of Kirkwood from November 15, 2008, to November 17, 2008, for complaints of vomiting, nausea, and left lower quadrant pain.  (Tr. 261).  Upon examination, plaintiff's breath sounds were normal.  (Tr. 262).  Abdominal tenderness was noted.  (Id.).  Plaintiff was diagnosed with hematuria, vomiting, and left lower quadrant abdominal pain.  (Tr. 263).  A CT scan revealed right kidney stone.  (Tr. 264).  A urologist recommended treatment of the right kidney stone and further evaluation of the left lower quadrant pain.  (Tr. 265).  Further evaluation revealed a symptomatic left inguinal hernia,[22] and recurrent right inguinal hernia.  (Tr. 266).  Plaintiff was discharged with limitations on his activity.  (Id.).  Plaintiff was instructed to follow-up on an outpatient basis to discuss an elective repair of his inguinal hernias.  (Id.).

---

[20]Formation or presence of a calculus or calculi in one or both ureters.  Stedman's at 2072.

[21]Subnormal oxygenation of arterial blood.  Stedman's at 939.

[22]Hernia at the inguinal region, which occurs when soft tissue protrudes through a weak point or tear in the lower abdominal wall.  See Stedman's at 880.

On November 21, 2008, plaintiff underwent a cystoscopy[23] with right lithotripsy.[24] (Tr. 272).

Plaintiff presented to Cedar Hill Family Medicine on January 29, 2009, to establish care. (Tr. 344). Plaintiff complained of right sided pleuritic[25] pain, some shortness of breath, difficulty sleeping, and occasional depression. (Id.). Upon examination, plaintiff's right lung was clear without wheeze, rale or rhonchi, although diminished breath sounds were noted. (Id.). The impression of Paul Metcalf, D.O., was pleuritic pain, status post right lobectomy;[26] elevated blood pressure, likely hypertension; and history of nephrolithiasis, status post stenting. (Id.). Dr. Metcalf prescribed pain medication, and blood pressure medication, and referred plaintiff to a pulmonologist. (Id.). Plaintiff presented for follow-up on April 21, 2009, at which time he complained of left sided chest pain. (Tr. 883). Plaintiff's medications were refilled. (Id.).

Plaintiff presented to Gautam Rohatgi, D.O., psychiatrist, on March 12, 2009, with complaints of anxiety and depression. (Tr. 970). Plaintiff reported symptoms of depressed mood due to decreased function, decreased appetite and energy, poor concentration, and decreased sleep. (Id.). Upon mental status examination, plaintiff's affect was sad and depressed, his mood was tired, and plaintiff's insight and judgment were good. (Tr. 971). Dr. Rohatgi diagnosed

---

[23]The inspection of the interior of the bladder by means of a cystoscope. Stedman's at 486.

[24]The crushing of a stone in the renal pelvis, ureter, or bladder, by mechanical force, laser, or focused sound energy. Stedman's at 1111.

[25]Relating to pleurisy, which is the inflammation of the pleura. See Stedman's at 1512.

[26]Excision of a lobe of any organ or gland. Stedman's at 1114.

plaintiff with major depressive disorder,[27] insomnia, and rule out generalized anxiety disorder,[28] and a GAF[29] score of 55 to 60.[30]  (Id.).  He prescribed Trazodone[31] to treat plaintiff's insomnia. (Tr. 973).

Plaintiff presented to Dr. Rohatgi for follow-up on March 26, 2009, at which time he reported no benefit from the Trazodone.  (Tr. 968).  Dr. Rohatgi discontinued the Trazodone and started plaintiff on Mirtazapine.[32]  (Tr. 969).  On April 9, 2009, plaintiff reported no change in his mood or sleep.  (Tr. 966).  Plaintiff indicated that he spent a lot of time with his dogs and working in the home and the yard.  (Id.).  Dr. Rohatgi continued the Mirtazapine and added Trazodone and Wellbutrin.  (Tr. 967).  On April 30, 2009, plaintiff reported no depressed mood or anxiety, although irritability and anger were present at times.  (Tr. 964).  Plaintiff still reported some difficulty with insomnia.  (Id.).  Plaintiff indicated that he was physically active during the day.

---

[27]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness.  Stedman's at 515.

[28]A psychological disorder in which anxiety or morbid fear and dread accompanied by autonomic changes are prominent features.  Stedman's at 569.

[29]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[30]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV at 32.

[31]Trazodone is an antidepressant drug indicated for the treatment of depression and other mood disorders.  See WebMD, http://www.webmd.com/drugs (last visited August 30, 2012).

[32]Mirtazapine is an antidepressant indicated for the treatment of major depressive disorder. See PDR at 2924-25.

(Id.).  Dr. Rohatgi discontinued the Mirtazapine and Trazodone, increased the Wellbutrin, and added Ambien.  (Tr. 965).

Plaintiff presented to Saint Louis ConnectCare pulmonary clinic on May 1, 2009.  (Tr. 896-902).  Plaintiff complained of left-sided pleuritic pain.  (Tr. 899).  Plaintiff underwent a chest x-ray, which was normal.  (Tr. 903).  The impression of the examining pulmonologist was shortness of breath/pleuritic chest pain.  (Tr. 901).  It was noted that plaintiff's records were required for review.  (Id.).

Plaintiff presented to Dr. Rohatgi for follow-up on May 14, 2009, at which time plaintiff reported that he still had no depression or anxiety but experienced irritability and anger.  (Tr. 976).  Plaintiff indicated that he was getting eight hours of sleep a day with the Ambien.  (Id.).  Plaintiff remained physically active.  (Id.).  Upon examination, plaintiff's affect was appropriate and bright, plaintiff was attentive and smiled during the interview, and plaintiff's mood was much better.  (Id.).  Dr. Rohatgi diagnosed plaintiff with major depressive disorder, currently euthymic; insomnia; and a GAF score of 60.  (Tr. 976-77).  Dr. Rohatgi discontinued the Wellbutrin, continued the Ambien, and added Celexa.  (Tr. 977).

Plaintiff presented to Dr. Rohatgi on June 11, 2009, at which time plaintiff reported no symptoms of depression or anxiety, and indicated that his irritability and anger had improved since the initiation of Citalopram.  (Tr. 974).  Plaintiff complained of difficulty sleeping despite increasing his dosage of Ambien.  (Id.).  Upon examination, plaintiff's affect was more bright than on his last visit, and his mood was good.  (Id.).  Plaintiff's insight was good and his judgment was

fair.  (Id.).  Dr. Rohatgi assessed a GAF score of 50.[33]  (Id.).  He continued plaintiff's medications and instructed plaintiff not to increase his medication by himself.  (Tr. 975).  On July 9, 2009, plaintiff reported no symptoms of depression or anxiety.  (Tr. 978).  Plaintiff indicated that his irritability and anger had improved, and that the Ambien was of benefit.  (Id.).  Dr. Rohatgi diagnosed plaintiff with major depressive disorder, in full remission; insomnia; and assessed a GAF score of 55 to 60.  (Id.).

Plaintiff presented to the pulmonary clinic at Saint Louis ConnectCare on July 27, 2009, for follow-up.  (Tr. 889-91).  Plaintiff complained of chronic pain.  (Id.).  The physician had reviewed plaintiff's medical records. (Tr. 892-93).  Plaintiff underwent a chest x-ray, which revealed no evidence of active disease in the chest.  (Tr. 895).  Plaintiff was advised to control his weight, exercise daily, and avoid tobacco and other inhaled irritants.  (Tr. 890).  It was noted that plaintiff may benefit from a referral to a pain specialist for long-term management.  (Id.).  The physician concluded that there was no indication for further pulmonary work-up.  (Id.).

Plaintiff saw Dr. Rohatgi for follow-up on August 13, 2009, at which time plaintiff had no symptoms of depression, anxiety, anger, or irritability.  (Tr. 982).  Plaintiff reported that he was eating and sleeping well.  (Id.).  Dr. Rohatgi diagnosed plaintiff with major depressive disorder in full remission, with a GAF score of 55 to 60.  (Id.).  On November 12, 2009, plaintiff reported a sad mood due to the change in his life status as he was not working and had no active social life.  (Tr. 980).  Plaintiff was able to perform activities of daily living.  (Id.).  Upon examination,

---

[33]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 32.  A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Id. at 32.

plaintiff's affect was appropriate and his mood was good.  (Id.).  Dr. Rohatgi diagnosed plaintiff

with major depressive disorder in full remission, and assessed a GAF score of 55 to 60.  (Tr. 981).

Plaintiff also started attending individual therapy on approximately a monthly basis beginning on

November 12, 2009.  (Tr. 989).

Plaintiff presented to Xiaohui Fan, M.D. on November 19, 2009, for treatment of his right

chest wall pain.  (Tr. 913-15).  Plaintiff reported severe right chest wall pain, which interfered

with most daily activities, and with his sleep.  (Tr. 913).  Upon examination, plaintiff had normal

breath sounds, with hypersensitivity and allodynia[34] in the right upper chest area and decreased air

exchange on the right side.  (Tr. 914).  Dr. Fan diagnosed plaintiff with right chest wall post-

surgical pain and right intercostal neuralgia.  (Id.).  Dr. Fan prescribed Vicodin, Lidoderm, and

Neurontin.  (Tr. 915).

Plaintiff presented to Dr. Fan for follow-up on December 17, 2009, and on January 14,

2010, at which time plaintiff reported moderate right chest wall pain, which interfered with only

some daily activities.  (Tr. 910, 908).  Dr. Fan continued plaintiff's medication regimen, and

indicated that he would consider performing an intercostal block if plaintiff's pain worsened.

(Id.).

Plaintiff presented to Dr. Rohatgi for a follow-up on January 28, 2010, at which time

plaintiff reported no symptoms of anxiety, depression, irritability, agitation, or anger.  (Tr. 972).

Plaintiff indicated that he was sleeping well, eating very well, and was able to perform activities of

daily living.  (Id.).  Dr. Rohatgi diagnosed plaintiff with major depressive disorder in full

remission, and assessed a GAF score of 60.  (Id.).  Plaintiff's medications were continued.  (Tr.

---

[34]Condition in which ordinarily nonpainful stimuli elicit pain.  Stedman's at 52.

984).  Dr. Rohatgi also recommended that plaintiff continue therapy.  (Id.).

Plaintiff presented to the pulmonary clinic at Saint Louis ConnectCare on March 8, 2010, with complaints of shortness of breath when waking up in the mornings, along with a burning sensation in his chest.  (Tr. 1001).  Plaintiff indicated that these symptoms resolve over the course of the day.  (Id.).  Upon examination, no wheezing or rhonchi were heard.  (Tr. 1002).  Plaintiff was advised to control his weight, exercise daily, and avoid tobacco and inhaled irritants.  (Id.). A chest x-ray was ordered.  (Id.).  It was noted that plaintiff's complaints of dyspnea were "puzzling," as they resolved with activity and did not awaken him from sleep.  (Id.).  Possible causes included asthma due to pet allergens at night; reflux at night; and, the least likely, diaphragmatic weakness from prior surgeries.  (Id.).  Plaintiff was advised not to allow pets on his bed, and was counseled on diet changes.  (Id.).  Advair[35] was prescribed.  (Id.).

Plaintiff underwent a chest x-ray on March 8, 2010, which revealed no evidence of active disease in the chest.  (Tr. 1003).

## The ALJ's Determination

The ALJ made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through March 31, 2012.

2.   The claimant has not engaged in substantial gainful activity since May 24, 2006, the alleged onset date (20 CFR 404.1571 et seq., and 20 CFR 416.971 et seq.).

3.   The claimant has the following severe impairments: chronic obstructive pulmonary disease status post pleurectomy and depression (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that

---

[35]Advair is indicated for the treatment of asthma.  See PDR at 1276.

meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he is limited to unskilled work.  The claimant cannot climb ropes, ladders, or scaffolds; he can occasionally climb ramps and stairs; he must avoid concentrated exposure to industrial hazards and unprotected heights; and he must avoid even moderate exposure to pulmonary irritants.  He cannot perform jobs requiring depth perception and he must work in a temperature-controlled environment.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on June 22, 1983 and was 22 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 an 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from May 24, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-20).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on December 30, 2008, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on December 30, 2008,

the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 20).

**Discussion**

A.      **Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel,

222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v.

Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th

Cir. 1992).  The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence

in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141

F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."

Id.

B.      **The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of

- 25 -

not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant

has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d

598, 601 (8th Cir. 1997).

 The SSA Commissioner has established a five-step process for determining whether a

person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-

42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895

(8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial

gainful employment."  If the claimant is, disability benefits must be denied.

See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the

claimant suffers from a medically severe impairment or combination of impairments.

 See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must

significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age,

education and work experience of a claimant are not considered in making the "severity"

determination.  See id.

 If the impairment is severe, the next issue is whether the impairment is equivalent to one of

the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial

gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in

Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See

20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the

next step which inquires into whether the impairment prevents the claimant from performing his

or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform

- 26 -

the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758.  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

**C.    Plaintiff's Claims**

Plaintiff argues that the ALJ erred in determining plaintiff's residual functional capacity. Plaintiff next argues that the ALJ relied on improper vocational expert testimony in determining plaintiff's ability to perform other work.  Plaintiff finally argues that the ALJ erred in assessing the

credibility of plaintiff's subjective complaints.  The undersigned will discuss plaintiff's claims in turn, beginning with the ALJ's credibility analysis.

1.      **Credibility Analysis**

Plaintiff argues that the ALJ erred in determining the credibility of plaintiff's subjective complaints of pain and limitation.  Defendant contends that the ALJ made a proper credibility determination and found that plaintiff's allegations regarding his limitations were not fully credible.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors."  Kelley v. Callahan, 133 F.3d 583, 588 (8th Cir. 1998).  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.  Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints.  Id.  The ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole.  Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole.

"[T]he question is not whether [plaintiff] suffers any pain; it is whether []he is fully credible when []he claims that [the pain] hurts so much that it prevents h[im] from engaging in h[is] prior work." Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987).  Thus, the relevant inquiry is whether or not plaintiff's complaints that his pain is at a degree of severity that prevents him from working are credible.

In the present case, the ALJ properly pointed out the Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. (Tr. 17-18).  The ALJ first discussed the medical evidence regarding plaintiff's physical impairments and found that it did not support plaintiff's subjective complaints.  (Tr. 17).  The ALJ noted that, although plaintiff alleges disability due to right eye blindness, there are no medical records to support this allegation.  (Tr. 17).  With respect to plaintiff's lung problems, the ALJ noted that chest x-rays have consistently been negative for active disease.  (Id.).  The ALJ also pointed out that plaintiff's pulmonologist indicated that he did not know the cause of plaintiff's complaints of shortness of breath upon waking in the morning.  (Tr. 17, 1002).  Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility.  See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).

With regard to plaintiff's mental impairments, the ALJ noted that, on January 28, 2010, plaintiff's psychiatrist noted that plaintiff's major depressive disorder was in full remission.  (Tr. 17, 972).  At that time, plaintiff reported no symptoms of anxiety, depression, irritability, agitation, or anger.  (Id.).  Plaintiff indicated that he was sleeping and eating well, and was able to perform activities of daily living.  (Id.).

The ALJ next pointed out that plaintiff did not have a good work history.  (Tr. 18).
Although not controlling on the issue of plaintiff's complaints of disabling pain, a claimant's work
history is a proper factor in assessing credibility.  See Brown v. Chater, 87 F.3d 963, 965 (8th Cir.
1996).  A poor work history prior to the alleged onset of disability lessens the credibility of a
plaintiff's allegations of disabling pain.  See Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993).

The ALJ noted that plaintiff claimed that he had presented to the emergency room on
twelve occasions, and that he was transported by ambulance the majority of the time.  (Tr. 54-55).
The record, however, reveals only one instance of plaintiff being transported by ambulance.  (Tr.
309).  The ALJ pointed out that, although the record was left open after the hearing, plaintiff did
not provide any evidence of these additional visits.  (Tr. 18).  The fact that plaintiff apparently
exaggerated his emergency room visits detracts from his credibility.

The ALJ also noted that plaintiff drew unemployment benefits after he left his job in
October 2008, until one week before the hearing in January 2010.  (Tr. 18).  The application for
unemployment benefits requires an assertion of the ability to work and is facially inconsistent with
a claim of disability.  Cox v. Apfel, 160 F.3d 1203, 1208 (8th Cir. 1998); Barrett v. Shalala, 38
F.3d 1019, 1024 (8th Cir. 1994).

Finally, the ALJ noted that none of plaintiff's treating or examining doctors has stated that
plaintiff was unable to work.  (Tr. 18).  The presence or absence of functional limitations is an
appropriate Polaski factor, and "[t]he lack of physical restrictions militates against a finding of
total disability."  Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999)(citing Smith v. Shalala, 987
F.2d 1371, 1374 (8th Cir. 1993)).

Plaintiff contends that the ALJ erred in failing to consider the side effects of plaintiff's
medications.  Specifically, plaintiff argues that he "spends the majority of the day sleeping and

- 30 -

taking antidepressant medication." (Tr. 33). Plaintiff, however, does not cite to any medical records in which plaintiff complained of side effects from his medications. As such, plaintiff's claim lacks merit.

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain and limitations are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence.

Accordingly, the decision of the Commissioner will be affirmed as to this point.

**2.      Residual Functional Capacity**

Plaintiff argues that the ALJ erred in determining plaintiff's RFC. Plaintiff contends that the RFC formulated by the ALJ failed to include additional exertional and nonexertional limitations supported by the record.

It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of her limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. § 404.1545. It is the claimant's burden, and not the Social Security Commissioner's burden to prove the claimant's RFC. Pearsall, 274 F.3d at 1218. Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity]

and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).

The ALJ made the following determination with regard to plaintiff's residual functional capacity:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he is limited to unskilled work.  The claimant cannot climb ropes, ladders, or scaffolds; he can occasionally climb ramps and stairs; he must avoid concentrated exposure to industrial hazards and unprotected heights; and he must avoid even moderate exposure to pulmonary irritants.  He cannot perform jobs requiring depth perception and he must work in a temperature-controlled environment.

(Tr. 15).

Plaintiff first argues that the RFC formulated by the ALJ did not include additional exertional limitations supported by the evidence.  Specifically, plaintiff argues that he testified that he was unable to walk more than about fifteen minutes or stand for more than fifteen to twenty minutes.  (Tr. 35).  Plaintiff contends that these limitations are supported by the medical evidence, which reveals frequent complaints of chest pain, shortness of breath, and arm pain, which would preclude even sedentary work.

The ALJ, however, properly credited plaintiff's testimony regarding his ability to walk and stand when limiting plaintiff to sedentary work.  Sedentary work is defined as follows:

> Sedentary work involves lifting no more than 10 pounds at a time an occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567, 416.967.  As such, plaintiff's testimony that he was capable of walking fifteen minutes at a time, and standing for fifteen minutes at a time is consistent with the

performance of sedentary work.  Sedentary work requires sitting the majority of the time, and

there is no evidence that plaintiff's shortness of breath would be aggravated by sitting.  While

plaintiff did complain of pain, the ALJ found that plaintiff failed to provide medical evidence

supporting the etiology of these complaints.

The limitations found by the ALJ as a result of plaintiff's pulmonary impairment are

consistent with the objective medical evidence.  In January of 2007, plaintiff's treating

pulmonologist, Dr. Fonseca, found that plaintiff's physical examination was unremarkable, and

that a chest x-ray revealed excellent re-expansion of the lung with no evidence of recurrent

pneumothorax.  (Tr. 233).  Plaintiff requested a disability letter from Dr. Fonseca, but Dr.

Fonseca declined, noting "I would have thought he would have returned to work several months

ago, in light of no complaints when seen three months ago.  From my standpoint he should be

fully recovered form his surgery at this point and in fact 3 months ago appeared to be so."  (Id.).

On March 9, 2007, plaintiff reported that he felt that he was relatively back to normal.  (Tr. 232).

Dr. Fosenca found that plaintiff had "recovered from all his major difficulties," and indicated that

he would see plaintiff on an as-needed basis only.  (Id.).  In a letter dated September 19, 2007,

Dr. Fonseca stated that plaintiff had "no surgical restrictions of limitations of duty."  (Tr. 242).

Plaintiff underwent chest x-rays due to complaints of chest pain in January 2008, February 2008,

May 2008, May 2009, July 2009, and March 2010, which revealed no evidence of acute

cardiopulmonary disease.  (Tr. 217, 322, 310, 903, 895, 1003).  Plaintiff also received treatment

from the pulmonary clinic at Saint Louis ConnectCare from May 2009 through March 2010.  On

July 27, 2009, no evidence of active disease pulmonary disease was found, and it was noted that

there was no indication for further pulmonary work-up.  (Tr. 890).  Plaintiff was advised to

exercise daily, control his weight, and avoid tobacco and other inhaled irritants.  (Tr. 890).

- 33 -

Plaintiff complained of shortness of breath in the mornings on March 8, 2010.  (Tr. 1001).  Upon examination, no wheezing or rhonchi were heard.  (Tr. 1002).  Plaintiff's complaints were described as "puzzling."  (Id.).  In sum, while plaintiff's pulmonary impairment would be expected to cause some restrictions, the medical evidence does not support any greater exertional restrictions than those found by the ALJ.

Plaintiff also argues that the ALJ failed to include additional limitations in plaintiff's RFC arising from plaintiff's right eye blindness or to order a consultative examination.  As support for this claim, plaintiff argues that Dr. Shen specifically noted a history of right eye blindness on October 18, 2006.  (Tr. 881).

As plaintiff notes, Dr. Shen did indicate that plaintiff had a history of an eye injury from a golf club when he was about ten years old.  (Tr. 880).  Dr. Shen, however, also noted that this incident resulted in no "permanent impairments."  (Id.).  In fact, upon examination, Dr. Shen found that plaintiff's pupils had equal reactivity despite plaintiff's claim of being blind in the right eye.  (Tr. 881).  As such, there is no support for plaintiff's allegations of right eye blindness, and the ALJ did not err in failing to include additional limitations or further develop the record.

Finally, plaintiff argues that the ALJ erred in failing to include any nonexertional limitations arising from plaintiff's mental impairment.  Plaintiff points out that the ALJ found at step two that plaintiff's depression was a severe impairment, and that plaintiff's depression caused moderate difficulties in plaintiff's concentration, persistence, or pace.  (Tr. 15).  Specifically, the ALJ noted, "I will credit the claimant's complaints of decreased ability to concentrate because of his mental health issues."  (Id.).

As previously discussed, the ALJ properly noted that plaintiff's treating psychiatrist, Dr. Rohatgi found on January 28, 2010 that plaintiff's major depressive disorder was "in full

remission."  (Tr. 17, 972).  At that time, plaintiff reported no symptoms of anxiety, depression,

irritability, agitation, or anger.  (Tr. 972).  Plaintiff also indicated that he was sleeping well, eating

very well, and was able to perform activities of daily living.  (Id.).  In fact, Dr. Rohatgi first

diagnosed plaintiff with major depressive disorder in full remission in July 2009, at which time

plaintiff reported no symptoms of depression or anxiety, and that this irritability and anger had

improved.  (Tr. 978).  Dr. Rohatgi's diagnosis remained at follow-up visits in August of 2009,

and November of 2009.  (Tr. 981-82).  The ALJ, however, credited plaintiff's complaints of

decreased ability to concentrate and limited plaintiff to unskilled work.  As such, the ALJ properly

considered the effects of plaintiff's depression in determining his RFC.

 In sum, the RFC formulated by the ALJ is supported by substantial evidence in the record

as a whole.  The medical record does not support the presence of any greater limitations than

those found by the ALJ.  Accordingly, the decision of the Commissioner will be affirmed as to this

point.

**3.     Plaintiff's Ability to Perform Other Work**

 Plaintiff argues that the ALJ relied on improper testimony from the vocational expert

regarding plaintiff's ability to perform other work.  Specifically, plaintiff contends that the

vocational expert admitted that plaintiff could not work as a night clerk without a GED, yet the

ALJ found at step five that plaintiff could perform other work as a night clerk and fabricator.

 Once it is determined, as it was here, that the claimant cannot perform past relevant work,

the burden shifts to the Commissioner to show that the claimant can perform other work as it

exists in the national economy.  Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994).  Work exists

in the national economy when there is a "significant number of jobs (in one or more occupations)"

having requirements which the claimant is able to meet with his physical or mental abilities and

vocational qualifications.  20 C.F.R. § 404.1566(b).  In determining whether work exists in significant numbers, "the decision should be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation."  Jenkins v. Bowen, 861 F.2d 1083, 1087 (8th Cir. 1988).

Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question.  Grissom v. Barnhart, 416 F.3d 834, 837 (8th Cir. 2005).  To be properly phrased, the hypothetical question posed to a VE must include all physical and mental impairments the ALJ finds to be credible.  House v. Shalala, 34 F.3d 691, 694 (8th Cir. 1994).

In this case, the ALJ included all of the limitations he found to be credible, consistent with his RFC determination.  The vocational expert testified that plaintiff could perform the positions of hotel night clerk and assembly line fabricator.  (Tr. 58).  Upon further questioning by plaintiff's attorney, however, the vocational expert testified that a GED would be a basic requirement for the hotel night clerk position.  (Tr. 60).  Plaintiff had not earned a GED at the time of the hearing. (Tr. 51).

Although the undersigned agrees with plaintiff that the ALJ's finding that plaintiff was capable of performing work as a hotel night clerk is not supported by substantial evidence, this error was harmless as the ALJ also found that plaintiff was capable of performing work as a fabricator.  The vocational expert testified that there were 120,000 fabricator jobs nationally, and 3,000 jobs in Missouri.  (Tr. 58).  The Eighth Circuit has held that lesser amounts of jobs available constituted work existing in significant numbers.  See, e.g. Johnson v. Chater, 108 F.3d 178, 180 (8th Cir. 1997) (200 jobs in Iowa was significant number); Jenkins, 861 F.2d at 1087 (500 jobs available in the region).  As such, the ALJ's determination that plaintiff was capable of performing

other work that exist in significant numbers in the national economy is supported by substantial evidence.

<u>**Conclusion**</u>

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment or combination of impairments.  Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this __24th__ day of September, 2012.

_____
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE